No. 24-5056

# In the United States Court of Appeals for the Sixth Circuit

MOMS FOR LIBERTY – WILSON COUNTY, TN;
ROBIN LEMONS; AMANDA DUNAGAN-PRICE

*Plaintiffs-Appellants*

v.

WILSON COUNTY, TN
BOARD OF EDUCATION, *et al.*

*Defendants-Appellees*

On Appeal from the United States District
Court for the Middle District of Tennessee
The Hon. Eli Richardson, District Judge
(Dist. Ct. No. 3:23-cv-211)

BRIEF FOR THE APPELLANTS

John I. Harris
SCHULMAN, LEROY & BENNETT PC
3310 West Avenue
Suite 460
Nashville, Tennessee 37203
615-244-6670


February 28, 2024

Brett R. Nolan
INSTITUTE FOR FREE SPEECH
1150 Connecticut Ave., N.W.
Suite 801
Washington, DC 20036
202-301-3300
bnolan@ifs.org

*Counsel for Plaintiffs-Appellants*

DISCLOSURE STATEMENT

Counsel for Plaintiffs-Appellants Moms for Liberty – Wilson County, TN, Robin Lemons, Amanda Dunagan-Price, states that none of the plaintiffs is a subsidiary or affiliate of a publicly owned corporation and no publicly owned corporation has a substantial interest in the outcome of this litigation.


<u>/s/ Brett R. Nolan</u>

TABLE OF CONTENTS

DISCLOSURE STATEMENT ...................................................... i

TABLE OF CONTENTS ......................................................... ii

TABLE OF AUTHORITIES...................................................... iv

STATEMENT REGARDING ORAL ARGUMENT ............................... viii

STATEMENT OF JURISDICTION .................................................. 1

STATEMENT OF ISSUES ........................................................... 2

INTRODUCTION ..................................................................... 3

STATEMENT OF THE CASE ....................................................... 4

    A.   The Wilson County Board of Education's policies for public comments. ................................................................. 4

    B.   The Board censors Robin Lemons and intimidates members of Moms for Liberty into silence. ................................. 7

    C.   The Board re-writes its rules to avoid a preliminary injunction. ............................................................. 13

    D.   The ongoing impact of the Board's censorship. ........................ 15

    E.   The district court's decision denying a preliminary injunction. ............................................................. 16

SUMMARY OF ARGUMENT ...................................................... 17

STANDARD OF REVIEW .......................................................... 18

ARGUMENT ......................................................................... 19

  I.   PLAINTIFFS ARE LIKELY TO PREVAIL ON THE MERITS......................... 20

    A.   Requiring speakers to declare their home address is unreasonable................................................................ 21

    B.   The abusive-speech rule discriminates based on viewpoint...... 26

    C.   The public-interest rule discriminates based on viewpoint. ..... 28

    D.   The public-interest rule is an unconstitutional prior restraint. ................................................................. 33

II.  THE REMAINING FACTORS FAVOR AN INJUNCTION BECAUSE PLAINTIFFS WILL ALMOST CERTAINLY WIN ON THE MERITS. ..............37

III. THE BOARD'S VOLUNTARY CESSATION NEITHER MOOTS PLAINTIFFS' CHALLENGE NOR VITIATES THEIR IRREPARABLE HARM. ...................38

A.  The Board's voluntary cessation did not moot the request for a preliminary injunction. ...........................................................39

B.  Voluntary cessation does not vitiate irreparable harm in First Amendment cases............................................................44

C.  The Board's discriminatory enforcement of its obviously unconstitutional rules creates an ongoing threat of irreparable harm. .......................................................................49

CONCLUSION ..............................................................................50

CERTIFICATE OF COMPLIANCE ...................................................51

CERTIFICATE OF SERVICE .........................................................52

ADDENDUM.................................................................................53

TABLE OF AUTHORITIES

## Cases

*ACLU Fund of Mich. v. Livingston Cnty.*,
796 F.3d 636 (6th Cir. 2015) ................................................. 38

*Am. for Prosperity Found. v. Bonta*,
141 S. Ct. 2373 (6th Cir. 2021) ............................................ 24

*Am. Freedom Def. Initiative v. Suburban Mobility Auth. for Reg'l Transp.*,
698 F.3d 885 (6th Cir. 2012) ............................................... 19

*Am. Freedom Def. Initiative v. Suburban Mobility Auth. for Reg'l Transp.*,
978 F.3d 481 (6th Cir. 2020) ......................... 20, 27, 28, 33

*Arizona v. Biden*,
40 F.4th 375 (6th Cir. 2022) ............................................... 18

*Bd. of Airport Comm'rs v. Jews for Jesus*,
482 U.S. 569 (1987) ............................................................ 21

*Bevan & Assocs., LPA v. Yost*,
929 F.3d 366 (6th Cir. 2019) ............................................... 31

*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*,
473 U.S. 788 (1985) ............................................................ 20

*Forsyth Cnty., Ga. v. Nationalist Movement*,
505 U.S. 123 (1992) ...................................................... 34, 35

*G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*,
23 F.3d 1071 (6th Cir. 1994) ............................................... 49

*Iancu v. Brunetti*,
139 S. Ct. 2294 (2019) .................................................. 29, 31

*Int'l Outdoor, Inc. v. City of Troy*,
361 F. Supp. 3d 713 (E.D. Mich. 2019) ............................... 35

*Ison v. Madison Local Sch. Dist. Bd. of Educ.*,
3 F.4th 887 (6th Cir. 2021) .................. 20, 21, 24, 25, 26, 27, 28

iv

*Janus v. AFSCME, Council 31,*
   138 S. Ct. 2448 (2018) ........................................................... 21

*L.W. v. Skrmetti,*
   83 F.4th 460 (6th Cir. 2023) .................................................. 19

*Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.,*
   508 U.S. 384 (1993) ........................................................ 28, 33

*Lowery v. Jefferson Cnty. Bd. of Educ.,*
   586 F.3d 427 (6th Cir. 2009) ...................................... 20, 35, 36

*Marshall v. Amuso,*
   571 F. Supp. 3d 412 (E.D. Pa. 2021) ........................... 22, 23, 24

*Maryville Baptist Church, Inc. v. Beshear,*
   957 F.3d 610 (6th Cir. 2020) (per curiam) ............................ 31

*Matal v. Tam,*
   137 S. Ct. 1744 (2017) ...................................................... 26, 27

*McGlone v. Bell,*
   681 F.3d 718 (6th Cir. 2012) ........................................... 34, 49

*Mich. State AFL-CIO v. Schuette,*
   847 F.3d 800 (6th Cir. 2017) .................................................. 18

*Minn. Voters All. v. Mansky,*
   138 S. Ct. 1876 (2018) ............................................. 21, 22, 23, 25

*Obama for Am. v. Husted,*
   697 F.3d 423 (6th Cir. 2012) .................................................. 48

*Online Merchs. Guild v. Cameron,*
   995 F.3d 540 (6th Cir. 2021) .................................................. 19

*Performance Unlimited, Inc. v. Questar Publishers, Inc.,*
   52 F.3d 1373 (6th Cir. 1995) .................................................. 19

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n,*
   460 U.S. 37 (1983) .................................................................. 20

*Reed v. Town of Gilbert,*
   576 U.S. 155 (2015) ........................................................... 36, 37

*Resurrection School v. Hertel,*
   35 F.4th 524 (6th Cir. 2022) (en banc) ............................. 40, 41

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*,
    487 U.S. 781 (1988) ................................................21, 25

*Roman Catholic Diocese v. Cuomo*,
    141 S. Ct. 63 (2020) (per curiam) ...................................37, 46

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
    515 U.S. 819 (1995) ................................................20, 33

*S. Glazer's Distribs. of Ohio, LLC v. Great Lakes Brewing Co.*,
    860 F.3d 844 (6th Cir. 2017) ...........................................31

*Shuttlesworth v. Birmingham*,
    394 U.S. 147 (1969) ...................................................34

*Sierra Club v. United States EPA*,
    60 F.4th 1008 (6th Cir. 2023) ...........................................5

*Sisters for Life, Inc. v. Louisville-Jefferson Cnty.*,
    56 F.4th 400 (6th Cir. 2022) ...................19, 25, 37, 38, 48

*Speech First, Inc. v. Schlissel*,
    333 F. Supp. 3d 700 (E.D. Mich. 2018) .................................47

*Speech First, Inc. v. Schlissel*,
    939 F.3d 756 (6th Cir. 2019) ...............39, 40, 42, 43, 47, 48

*Thomas v. Chicago Park Dist.*,
    534 U.S. 316 (2002) ...................................................36

*United States v. City of Detroit*,
    401 F.3d 448 (6th Cir. 2005) ...................39, 40, 41, 45

*West Virginia v. EPA*,
    142 S. Ct. 2587 (2022) ................................................39, 42

**Statutes**

28 U.S.C. § 1292(a)(1) .......................................................1

28 U.S.C. § 1331 ............................................................1

Tenn. Code Ann. § 39-17-306 .................................................7

Tenn. Code Ann. § 8-44-102(a) ..............................................4

## Other Authorities

*In the national/public interest*," Merriam-Webster,
   available at https://perma.cc/4JV7-VJ2H ........................................... 31

STATEMENT REGARDING ORAL ARGUMENT

Plaintiffs request oral argument. This case concerns important questions about the First Amendment limits when local government agencies open their meetings for public comment, and oral argument will likely benefit the Court as it analyzes the constitutional issues at stake.

STATEMENT OF JURISDICTION

The district court had subject-matter jurisdiction under 28 U.S.C. § 1331 because Plaintiffs asserted claims arising under federal law. Complaint, R.1, PageID#16–28. The district court denied Plaintiffs' motion for a preliminary injunction on January 10, 2024. Mem. Op. & Order, R.30, PageID#247–62. Plaintiffs appealed that order on January 17, 2024. Notice of Appeal, R.32, PageID#264. This Court has jurisdiction under 28 U.S.C. § 1292(a)(1) over interlocutory decisions from the United States District Court for the Middle District of Tennessee denying a motion for a preliminary injunction.

1. Whether Plaintiffs are likely to succeed on their claim that the Wilson County Board of Education's policy requiring that speakers announce their address during the Board's public-comment period violates the First Amendment.

2. Whether Plaintiffs are likely to succeed on their claim that the Wilson County Board of Education's policy prohibiting "abusive" speech during its public-comment period violates the First Amendment.

3. Whether Plaintiffs are likely to succeed on their claim that the Wilson County Board of Education's requirement that individuals who want to speak on non-agenda items during the public-comment period prove their comments are "in the public interest" violates the First Amendment.

4. Whether the Wilson County Board of Education's partial voluntary cessation moots Plaintiffs' challenges to the Board's policies.

5. Whether the Wilson County Board of Education's partial voluntary cessation prevents a finding of irreparable harm.

6. Whether Plaintiffs are entitled to a preliminary injunction against the address rule, the abusive-speech rule, and the public-interest rule.

The Wilson County Board of Education does not particularly care for harsh criticism. So for years, the Board has relied on a mix of formal and informal rules to ward off the most controversial or disparaging remarks at its public meetings. The Board has required that individuals announce their home address before talking. It warns speakers that the chair will terminate their remarks if their speech is "abusive." And it only allows speakers to talk about issues not already on the Board's agenda if their comments will be "in the public interest." The effect of these policies needs little explanation: The rules discourage harsh criticism and allow the Board to screen out remarks it does not want to hear.

But the First Amendment guarantees people the right to criticize their local public officials without the threat of censorship or retaliation. It prevents the government from adopting policies that needlessly intimidate citizens into self-censoring. It prohibits the government from favoring some viewpoints over others. And it does not tolerate rules that allow government officials to rely on their own view of what's good or

bad for society when deciding who gets to speak. Yet the Wilson County Board of Education has done all the above.

The district court below denied a preliminary injunction that would stop the Board and its chair from enforcing its unconstitutional rules and practices. This Court should reverse.

A. The Wilson County Board of Education's policies for public comments.

1. The Wilson County Board of Education meets monthly for regular business. Policy 1.400, R.17-3, PageID#128. These meetings are open to the public, Tenn. Code Ann. § 8-44-102(a), and each includes a period for public comment. Price Decl., R.17-2, PageID#119–20 (¶6). During this time, the Board invites individuals and groups to speak about issues related to school policy and procedure. *Id.*

The process for speaking at board meetings has changed over the past year, but in general, speakers have two ways of participating. First an individual can ask for time on the meeting agenda, which requires

contacting a board member at least 24 hours before the meeting starts.[1]
Second, an individual can ask a board member for permission to speak
about an issue not already on the agenda. A board member can grant
requests to speak on a non-agenda item only upon determining that
doing so "is in the public interest." Policy 1.404 (June 7, 2021), R.17-4,
PageID#131; *see also* Policy 1.404 (Dec. 4, 2023), available at
https://perma.cc/YR8M-LBU7.

2. The Board relies on a mix of formal and informal rules to police
the boundaries of its public-comment period. Officially, Board Policy
1.404 governs public comments. Price Decl., R.17-2, PageID#123 (¶19);
Policy 1.404 (Dec. 4, 2023), available at https://perma.cc/YR8M-LBU7.
But in practice, the only rules that matter are those that the Board
chair decides to enforce—regardless of any written or unwritten policy.

---

[1] The Board used to divide this first category into two groups:
individuals who added an item to the agenda, and individuals who
wanted to speak on an agenda item already added. The Board recently
combined the two. *See* Policy 1.404 (Dec. 4, 2023), available at
https://perma.cc/YR8M-LBU7. This change does not affect this case, but
the Court can take judicial notice of the new policy if necessary. *See
Sierra Club v. United States EPA*, 60 F.4th 1008, 1014 n.2 (6th Cir.
2023).

One rule, for example, required individuals to publicly announce their name and address before speaking. This rule appeared in the Board's written policy for many years. Policy 1.404 (June 21, 2021), R.17-4, PageID#131. But the chair almost never enforced it. During 2022, 26 of the 45 speakers who made public comments did not state their address, despite Policy 1.404's requirement that they do so. Price Decl., R.17-2, PageID#126 (¶28). Yet Defendant Jamie Farough (the Board chair) enforced the rule only once—when Plaintiff Robin Lemons, who had been allowed to start speaking without announcing her address, began criticizing school officials. *Id.*

Another rule prohibited speakers from making "abusive" comments. Unlike the address rule, this rule never appeared in any formal policy. Rather, the source was the Board chair herself—she read a "script" at the beginning of each meeting admonishing speakers that the board can terminate any comments that are "abusive to an individual board member, the board as a whole, or the director of schools or any

employee of the school system." *Id.* at PageID#123 (¶20); Script, R.21-1, PageID#193; *see also* 10/3/22 Bd. Mtg. Video, R.17-13 at 00:20–35.[2]

The chair can enforce any of the Board's rules—formal or informal—by "terminat[ing] the remarks of any individual," and the Board's rules suggest that violations could lead to criminal charges. Policy 1.404, R.17-4, PageID#131 (citing Tenn. Code Ann. § 39-17-306). Farough reminds speakers of this policy at the outset of each public-comment period. Price Decl., R.17-2, PageID#123 (¶20).

### B. The Board censors Robin Lemons and intimidates members of Moms for Liberty into silence.

1. Plaintiff Amanda Price began worrying about her local school district in early 2021, first prompted by the school's response to the

---

[2] Plaintiffs conventionally filed video excerpts of 11 board meetings. *See* R.17-5 through R.17-15. Each meeting is also available in full on the Board's website: http://bit.ly/40vkunR (January 11, 2022); http://bit.ly/40w1TYM (February 7, 2022); http://bit.ly/3JGs34X (March 14, 2022); https://bit.ly/3DB6u1S (April 4, 2022); http://bit.ly/3lbb8gL (May 2, 2022); https://bit.ly/3WZ5MCz (June 6, 2022); http://bit.ly/3JJoFX2 (July 11, 2022); http://bit.ly/3l6kHxn (August 1, 2022); http://bit.ly/3Y9vrtz (September 12, 2022); http://bit.ly/3X1ZPop (October 3, 2022); http://bit.ly/3DKlvyr (November 11, 2022); http://bit.ly/3RzbKsO (December 5, 2022). *See* Price Decl., R.17-2, PageID#120–23 (¶¶7–18).

Covid pandemic, which "heavily impacted [her] personal life." Price Decl., R.17-2, PageID#118–19 (¶2). Her concerns widened as she started looking more closely at the county's education policies. *Id.* Price worried about an "overly political curriculum that tended to favor one ideological viewpoint over others." *Id.* And the "more [she] researched these issues, the more worried [she] became." *Id.*

So Price started a Wilson County chapter of Moms for Liberty ("M4L") with the goal of unifying, educating, and empowering parents to defend their parental rights. *Id.* at PageID#118–19 (¶¶2–3). M4L members "believe that parents must respectfully engage and advocate for transparency so they can make informed decisions about the education that their children receive in public schools." *Id.* at PageID#119 (¶3). As Price explains, the group "believe[s] that publicly advocating for change is the best way to end the harmful policies enacted by the Board of Education and other school administrators." *Id.*

Soon after launching M4L, Price and other members began attending and speaking at Board meetings. *Id.* at PageID#119–20 (¶¶4–5), 123–24 (¶¶20–21), 126 (¶¶27–28). They advocated for change on a variety of issues affecting Wilson County schools. But Price "never felt

comfortable sharing [her] honest, uncensored views." *Id.* at PageID#123
(¶21). She observed the Board chair repeatedly threaten to terminate
anyone's remarks if they became "abusive"—even though that rule was
nowhere to be found in Policy 1.404—and she worried about what she
might say that would cross the line. *Id.* at PageID#123–26 (¶¶21–27).
This led Price to "spen[d] significant time censoring her own remarks"
out of fear that a Board member "would take offense from [her]
comments and stop [her] from speaking." *Id.*

2. Plaintiff Robin Lemons began watching Board meetings with
other M4L members in 2022. Lemons Decl., R.17-1, PageID#110 (¶¶2–
3). Eventually, she felt compelled to speak after experiencing the
failures of several Wilson County school officials firsthand. *Id.* at
PageID#113 (¶13).

Lemons's fourth-grade daughter attended a Wilson County
elementary school in the fall of 2022. *Id.* at PageID#110 (¶1). One day,
her daughter told Lemons that she had been sexually propositioned by
another student at school. *Id.* at PageID#113 (¶13). Lemons alerted the
school principal but later learned that she failed to investigate the
incident or report it to Tennessee's Department of Children's services.

*Id.* Lemons also discovered that the Director of Schools lied about whether the incident had been reported when asked about it by a member of the Board. *Id.* So Lemons decided to speak directly to the Board about these problems. *Id.* at PageID#113–14 (¶¶15).

Lemons planned to speak at the October 3, 2022, meeting. *Id.* at PageID#113 (¶13). She spent significant time writing—and re-writing— her planned remarks because she worried that the Board would dislike her message and interrupt her or cut her time off. *Id.* at PageID#114 (¶16). She did not want the Board to prevent her from speaking by labeling her comments "abusive." *Id.* And she worried about having to disclose her home address when publicly speaking about such a sensitive topic. *Id.* (¶17). Lemons thus carefully tailored her message to avoid stepping over whatever line the Board might decide to enforce against her. *Id.* (¶¶16–17).

At the beginning of the October 3, 2022, public-comment period, Farough read her usual warning. *Id.* at PageID#114–15 (¶18). The individual who spoke immediately before Lemons declined to give her address, and Farough allowed her to speak without interruption. *Id.* at PageID#115 (¶19). As Lemons approached the podium, Farough asked

Lemons whether she needed to repeat the warning. 10/3/22 Bd. Mtg. Video, R.17-13 at 38:34–42. Lemons answered, "No," and explained that "for privacy concerns and my situation, I'm not going to disclose my address." *Id.* at 38:46–50. At that point, Farough did not stop Lemons from speaking.

Lemons began describing the incident in which her young child was propositioned for sex by another student. She spoke for almost a full minute uninterrupted—about a third of her allotted time. 10/3/22 Bd. Mtg. Video, R.17-13 at 38:52; Lemons Decl., R.17-1, PageID#115. But then Mike Jennings—the county attorney and legal advisor to the Board—interrupted her. He questioned whether the incident had been referred to the appropriate agency and suggested that Lemons shouldn't talk about it for confidentiality reasons. Lemons Decl., R.17-1, PageID#115–16 (¶¶21–22); *see also* 10/3/22 Bd. Mtg. Video, R.17-13 at 39:36–53.

Lemons clarified that she did not intend to disclose any names in her comments so there would be no privacy or confidentiality concerns. 10/3/22 Bd. Mtg. Video, R.17-13 at 40:02–09. Rather, she wanted to discuss the school officials who failed her daughter. Lemons explained

that the principal "failed to report it to [the Department of Children's Services], failed to investigate it whatsoever." *Id.* at 40:14–25. And then she turned her criticism toward the Director of Schools, Jeff Luttrell, who was sitting at the table with the Board: "Mr. Luttrell was told about this, lied about it being reported—" *Id.* at 40:24–29.

But Farough cut Lemons off.

As soon as Lemons mentioned the Director of Schools, Farough invoked Lemons's earlier refusal to disclose her address as an excuse for terminating her speaking time: "Ms. Lemons, you also refused to adhere to the guidelines of giving your address, so we've asked you to stop talking today, because there's, from my understanding there's more than one involved. And so we've asked that you stop, for now, and let this process continue." *Id.* at 40:28–45. Farough identified no other rule or policy that Lemons "refused to adhere to" other than failing to announce her address.

The next month, only two of the ten individuals who spoke during the Board's public-comment period announced their address. *Compare* 11/7/22 Board Mtg. Video, R.17-14 at 47:25–29 & 51:19–30 (stating an address) *with id.* at 01:09–21, 10:38–42, 16:39–42, 21:57–59, 37:13–17,

12

54:02–06, 57:30–32, & 59:44–46) (not stating an address). Farough did not terminate any of the other eight individual's remarks.

C. The Board re-writes its rules to avoid a preliminary injunction.

Plaintiffs sued and moved for a preliminary injunction. MPI & Memo., R.16 & 17, PageID#78–79, 81–109. The motion sought to enjoin three rules the Board uses to censor public comments: the requirement that speakers disclose their address, the "abusive" speech prohibition, and the rule requiring that comments about items not on the agenda be "in the public interest." Plaintiffs asked the Court to enjoin the Board from enforcing the rules—all of which chill M4L members' speech, including that of Lemons and Price.

The Board answered the complaint and denied that any of its policies violate the First Amendment. Answer, R.20, PageID#173–74 (¶¶11–18). Then, the Board tried to quickly moot part of Plaintiffs' challenge by revising its official (and unofficial) speaking rules.

First, the Board announced it had a new script for its chair that no longer ordered speakers to state their address or refrain from making "abusive" remarks. Response to MPI, R.21, PageID#179–80; New Script, R.21-2, PageID#194. The Board did not explain where the first script

came from, who modified it, or how either script binds the Board in any way. Nor did the Board take a vote on what the script should say.

Second, the Board revised Policy 1.404 to remove the address rule. Supp. Resp., R.26, PageID#230; Rev. Policy 1.404, R.26-4 (June 5, 2023), PageID#236. Unlike the script, which apparently can be changed on a whim, the Board voted to modify Policy 1.404. But that process was not complicated—the Board has modified Policy 1.404 three times since this suit was filed.[3] Not a single Board member discussed the policy change or explained his or her reasons for voting for the change.[4] The Board did not modify or repeal its policy requiring that non-agenda speech be in the "public interest."

Despite these maneuvers, the Board "maintain[s] that [its] policies and practices have at all times existed within the proper bounds of the First Amendment both facially and as applied to the Plaintiffs." Joint Case Management Plan, R.23-1, PageID#210.

---

[3] The current version of Policy 1.404, available at https://perma.cc/YR8M-LBU7, shows revisions on June 5, 2023, August 7, 2023, and December 4, 2023.

[4] *See* 05/01/23 Bd. Mtg. at 2:20:38–2:21:20, available at http://bit.ly/3X1ZPop; 06/05/23 Bd. Mtg. at 2:55:10–2:55:59, available at https://bit.ly/3oXUYtx.

D. The ongoing impact of the Board's censorship.

Since Farough censored her, Lemons has refrained from speaking at Board meetings altogether. Lemons Decl., R.17-1, PageID#116–17 (¶¶28–29). She would like to continue discussing her view that the school principal and the Director of Schools failed to properly handle a serious allegation of sexual misconduct at an elementary school. *Id.* But she cannot discuss such a sensitive and controversial topic if the Board requires her to first announce her home address, and she worries that Farough or other Board members may silence her if she speaks in the future. *Id.* at PageID#114. As Lemons explained, "Chairman Farough's selective enforcement of the [address rule] against me demonstrated that she is hostile to my viewpoint and is willing to use her authority to silence my speech." *Id.* at PageID#117 (¶29). Lemons thus continues to "refrain from speaking" to avoid further censorship. *Id.*

Price has likewise limited her speech out of fear that Farough will censor her. Price Decl., R.17-2, at PageID#125 (¶¶25–26). Price intends to continue speaking at Board meetings, as she has done in the past, to criticize the Board and other school officials for adopting harmful policies. *Id.* But Farough's pretextual censorship of Lemons has caused

Price to refrain from speaking out of fear that Farough will not tolerate Price criticizing school officials too harshly. *Id.*

E. The district court's decision denying a preliminary injunction.

The district court denied Plaintiffs' motion for a preliminary injunction as to all three challenged rules. Mem. Op. & Order, R.30, PageID#247–62.

First, the court addressed the challenge to the public-interest rule on the merits and held that Plaintiffs are not likely to succeed on their claim that it violates the First Amendment. *Id.* at PageID#253–54. The court determined that a rule requiring that speech be "in the public interest" does not discriminate based on viewpoint. *Id.* at PageID#255. It also held that the rule does not impose a prior restraint. *Id.* at PageID#259.

Second, the court declined to address whether Plaintiffs are likely to succeed on their challenge to the address or abusive-speech rules, instead holding that because the Board changed its rules in response to the motion, Plaintiffs no longer face irreparable harm. *Id.* at PageID#262.

The Court should reverse the denial of a preliminary injunction because there is an overwhelming likelihood that Plaintiffs will succeed on the merits of their claims. In the First Amendment context, that question all but decides whether to grant a preliminary injunction. Yet for two of Plaintiffs' three claims, the district court chose not to even address it.

I. Plaintiffs are likely to succeed on the merits because the three challenged rules prevent Wilson County citizens from freely speaking at the Board's public meetings. The requirement that individuals publicly announce their address serves no legitimate purpose while intimidating people from speaking on controversial or sensitive topics. And the prohibition against so-called abusive speech, as well as the requirement that speech on a non-agenda item be in the "public interest," impermissibly discriminate against people's viewpoints. On top of that, the public-interest rule acts as a prior restraint unbounded by any limitations on officials' discretion.

II. Because Plaintiffs are so likely to succeed on the merits, the remaining factors favor an injunction. Constitutional harm is always

irreparable—no matter how small or short in duration. And when constitutional rights are at stake, the equities tip in favor of protecting those rights.

III. That the Board tried to moot Plaintiffs' claims by revising its rules after facing a preliminary injunction does not require a different result. The Board meets none of the relevant factors for establishing mootness by way of voluntary cessation, as its hurried revisions to its policies and practices only highlight how easy it is to write and rewrite its rules. Nor does voluntary cessation on its own undermine a claim for irreparable harm when a defendant cannot otherwise meet its burden to prove mootness. The district court's reliance on the voluntary cessation to avoid discussing the merits of Plaintiffs' claims was contrary to law and must be reversed.

## STANDARD OF REVIEW

The Court reviews a decision denying a preliminary injunction for abuse of discretion. Ordinarily, that means reviewing the district court's legal conclusions "with fresh eyes," *Arizona v. Biden*, 40 F.4th 375, 381 (6th Cir. 2022), and its factual findings for clear error, *Mich. State AFL-CIO v. Schuette*, 847 F.3d 800, 803 (6th Cir. 2017). But "no such

deference applies to a written record like this one" where this Court is "in as good a position as the district judge to determine the propriety of granting a preliminary injunction," *L.W. v. Skrmetti*, 83 F.4th 460, 488–89 (6th Cir. 2023) (quoting *Performance Unlimited, Inc. v. Questar Publishers, Inc.*, 52 F.3d 1373, 1381 (6th Cir. 1995)); *see also Am. Freedom Def. Initiative v. Suburban Mobility Auth. for Reg'l Transp.*, 698 F.3d 885, 889–90 (6th Cir. 2012) ("[I]n cases with First Amendment implications, the standard of review is *do novo*.").

## ARGUMENT

Plaintiffs are entitled to a preliminary injunction because (1) they will likely succeed on the merits, (2) they will continue suffering irreparable harm absent an injunction, (3) the balance of equities tips in their favor, and (4) an injunction will serve the public interest. *Online Merchs. Guild v. Cameron*, 995 F.3d 540, 546 (6th Cir. 2021). All four factors favor Plaintiffs here. But "as in many First Amendment cases, the key inquiry is the first one: Who is likely to prevail on the constitutional claim?" *Sisters for Life, Inc. v. Louisville-Jefferson Cnty.*, 56 F.4th 400, 403 (6th Cir. 2022). The likelihood of success suffices to warrant a preliminary injunction.

I.      PLAINTIFFS ARE LIKELY TO PREVAIL ON THE MERITS.

"The Free Speech Clause limits the government's power to regulate speech on public property." *Am. Freedom Def. Initiative v. Suburban Mobility Auth. for Reg'l Transp.*, 978 F.3d 481, 485 (6th Cir. 2020). Those limits "var[y] depending on the forum where the speech occurs." *Ison v. Madison Local Sch. Dist. Bd. of Educ.*, 3 F.4th 887, 893 (6th Cir. 2021). A limited public forum exists where the government opens its property "for certain groups or for the discussion of certain topics." *Id.* (quoting *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995)). The public-comment period of a school board meeting is a limited public forum. *See Lowery v. Jefferson Cnty. Bd. of Educ.*, 586 F.3d 427, 432 (6th Cir. 2009); *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 & n.7 (1983).

While the government can restrict the topics discussed at a limited public forum (*i.e.*, "school policies and procedures"), any speech restrictions must be "reasonable in light of the purpose served by the forum" and viewpoint neutral. *Ison*, 3 F.4th at 893 (quoting *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 806 (1985)). That means the government "must be able to articulate some sensible basis

for" its rule. *Minn. Voters All. v. Mansky*, 138 S. Ct. 1876, 1888 (2018).

And regardless of its rationale, the government cannot "disfavor[]

certain points of view." *Ison*, 3 F.4th at 893 (quotation omitted).

### A. Requiring speakers to declare their home address is unreasonable.

A rule compelling speech is subject to the same constraints as a

prohibition against speaking. *Riley v. Nat'l Fed'n of the Blind of N.C.,*

*Inc.*, 487 U.S. 781, 796–97 (1988). That's because the right to free

speech includes the right to refrain from speaking. *Janus v. AFSCME,*

*Council 31*, 138 S. Ct. 2448, 2463 (2018). And so the Board's rule

"command[ing]" individuals to announce their address is subject to the

same constraints as any other content-based regulation. *See Riley*, 487

U.S. at 797. It must be "reasonable in light of the purpose served by the

forum." *Ison*, 3 F.4th at 893 (quotation omitted).

The address rule violates the First Amendment because "no

conceivable government interest" justifies requiring individuals to

publicly announce their address before speaking. *See Bd. of Airport*

*Comm'rs v. Jews for Jesus*, 482 U.S. 569, 575 (1987). That likely

explains why the Board almost never enforced the rule before Lemons.

And combined with its "clear" chilling effect, *see Marshall v. Amuso*, 571 F. Supp. 3d 412, 426 (E.D. Pa. 2021), the Board cannot meet its burden to articulate a "sensible basis" for this rule, *Mansky*, 138 S. Ct. at 1888.

So far, the Board has not explained the purpose of this rule at all. While it insists that the address rule is "within the proper bounds of the First Amendment," Joint Case Management Plan, R.23-1, PageID#210, it has not provided any reason for it. That alone means that Plaintiffs are likely to prevail on the merits. The Board bears the burden, which means it "must be able to articulate some sensible basis" for the rule. *Mansky*, 138 S. Ct. at 1888. Its failure to do so is fatal.

Perhaps the Board would justify its rule as necessary to ensure that speakers reside in Wilson County. There's good reason to doubt that justification, as the Board allows non-residents to speak. *See, e.g.*, 11/7/22 Board Mtg. Video, R.17-14 at 01:09–21 ("I reside in Nashville, Tennessee."). But suppose that's the Board's rationale. This still would not justify its requirement that individuals *publicly* disclose their home address to everyone listening.

One federal court recently explained why. In *Marshall*, a district court enjoined enforcement of a similar public-comment policy requiring

individuals to "preface their comments by an announcement of their name, address, and group affiliation." 571 F. Supp. 3d at 418. "While the right to speak at [school board] meetings is limited to students, employees, and residents within the District," the court explained, "requiring the speaker to announce their specific home address is an unreasonable restriction." *Id.* at 426. That's because "[e]ach speaker's address can be collected when they sign up for their speaking slot." *Id.* And gathering that information privately avoids the obvious "chilling effect of being forced to announce to all present one's actual home address before speaking on a hotly[] contested issue." *Id.*

The same reasoning applies here. The Board already requires that individuals sign up to speak before each meeting. So if the Board wants to verify residential status, "[e]ach speaker's address can be collected when they sign up for their speaking slot." *See Marshall*, 571 F. Supp. 3d at 426. The additional requirement that individuals publicly announce their address "bears little relationship" to the forum's purpose. *See Miller v. Cincinnati*, 622 F.3d 524, 536 (6th Cir. 2010).

The lack of any good reason for requiring public disclosure dooms the rule. *Mansky*, 138 S. Ct. at 1888. But the chilling effect further

compounds the problem. *See Marshall*, 571 F. Supp. 3d at 426. M4L members reasonably fear a backlash for criticizing school officials over sensitive and controversial topics. Lemons Decl. R. 17-1, PageID#114, 116–17 (¶¶17, 28); Price Decl. R. 17-2, PageID#124–25 (¶¶23, 25). Some of that comes with the territory—an individual deciding to speak about a contentious issue should expect pushback. But requiring speakers to publicly announce their home address adds a new dimension. It exponentially multiplies the fear of reprisal for taking unpopular positions on controversial matters—especially given that these meetings are streamed and stored online. *Cf. Am. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2388–89 (6th Cir. 2021).

That effect is real: Lemons has refrained from speaking at Board meetings since Farough censored her for refusing to disclose her address. Lemons Decl., R. 17-1, PageID#116–17 (¶28). And Price has self-censored her harshest criticism to avoid the same fate. Price Decl., R.17-2, PageID#125 (¶25). The rule thus undermines "the purpose served by the forum," *Ison*, 3 F.4th at 893, because it needlessly prevents some citizens from doing the very thing that the public-comment period exists for—speaking on matters of public concern, *see*

*Mansky*, 138 S. Ct. at 1891 (holding that a rule is unreasonable when it "undermine[s]" its own purpose).

One last point. As explained above, the disclosure requirement is a content-based regulation because it "command[s]" individuals to speak on a subject they would not otherwise speak. See *Riley*, 487 U.S. at 797. But if the Court disagrees and determines the rule is content neutral, it still violates the First Amendment.

Content-neutral restrictions on speech must be narrowly tailored to serve a significant government interest. *Ison*, 3 F.4th at 893. That means a rule cannot burden "substantially more speech than necessary." *Sisters for Life*, 56 F.4th at 404 (cleaned up). "A critical feature of this inquiry turns on whether the [government] seriously undertook to address the problems it faces with less intrusive tools readily available." *Id.* (cleaned up). "[M]ere convenience" cannot save a rule burdening speech when effective alternatives exist. *Id.* The government must show that its "interest would be achieved less effectively absent the regulation." *Ison*, 3 F.4th at 896 (quotation omitted).

Under this framework, the address rule still falls short. The Board can verify a speaker's residence just as "effectively" without requiring public disclosure. *See id.* In fact, public disclosure might be a less effective measure because the Board does not pause to confirm an individual's address once he or she begins speaking. It could much more effectively limit the public-comment period to Wilson County residents by collecting this information privately before a meeting starts. Thus, the Board cannot show that its "interest would be achieved less effectively absent the [disclosure rule]." *See id.* (quotation omitted).

B. The abusive-speech rule discriminates based on viewpoint.

The abusive-speech rule discriminates based on viewpoint—and the question is not close. This Court already said so when it invalidated a virtually identical rule just three years ago.

"The First Amendment's viewpoint neutrality principle protects more than the right to identify with a particular side." *Matal v. Tam*, 137 S. Ct. 1744, 1766 (2017) (Kennedy, J., concurring in part). It also includes "the right to create and present arguments for particular positions in particular ways, as the speaker chooses." *Id.* (emphasis added). Thus, laws prohibiting "offensive" or "disparaging" speech violate the First

Amendment even if those laws "evenhandedly prohibit[] disparagement of all groups, whether Democrats or Republicans, capitalists or socialists, or those arrayed on both sides of any other topic." *Am. Freedom Def. Initiative*, 978 F.3d at 499–500 (cleaned up). In other words, "[g]iving offense is a viewpoint." *Ison*, 3 F.4th at 894 (quotation marks omitted). The government cannot restrict speech merely because it offends or disparages some people. *Id.*

The Board's restriction against "abusive" speech falls in the same camp. In fact, this Court settled the issue in *Ison*. There, a school board opened a public-comment period and enacted a speech code like the one here: it prohibited "abusive" statements (among other things). *Id.* at 891. The Court explained that the ordinary definition of "abusive" is "harsh and insulting." *Id.* at 893. And so a restriction against "abusive" speech "plainly fit[s] in the 'broad' scope of impermissible viewpoint discrimination because . . . [it] prohibit[s] speech purely because it disparages or offends." *Id.* at 894 (quoting *Matal*, 137 S. Ct. at 1763).

*Ison* controls. The Board's restriction against "abusive" speech is indistinguishable from the rule invalidated in *Ison*. It discriminates

based on viewpoint by singling out speech that "disparages or offends." *See id.* The rule thus violates the First Amendment.

C. The public-interest rule discriminates based on viewpoint.

1. The Board's rule allowing individuals to speak on non-agenda items only if a Board member determines that doing so is "in the public interest," Policy 1.404, R.17-4, PageID#131, likewise discriminates on the basis of viewpoint. It "favor[s] some viewpoints or ideas at the expense of others," *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 394 (1993) (quotation omitted), and thus violates the First Amendment.

The Board, of course, can limit the public comments at its meetings to "certain topics." *Ison*, 3 F.4th at 893. In fact, it does so. The Board chair typically allows only comments "related to school policy or procedure." Price Decl., R.17-2, PageID#120 (¶6). "But the [Board] may not go further by [restricting] specific viewpoints on the topics that it allows." *Am Freedom Def. Initiative*, 978 F.3d at 498. Yet that is what this rule does: it prohibits speech on an otherwise permissible topic ("school policy or procedure") if a board member does not agree that the

message is "in the public interest"—a decision that turns entirely on one's viewpoint.

The Supreme Court's recent decision in *Iancu v. Brunetti*, 139 S. Ct. 2294 (2019), illustrates the problem well. *Brunetti* held that the Lanham Act's prohibition against "immoral or scandalous" trademarks discriminates based on viewpoint because it "allows registration of marks when their messages accord with, but not when their messages defy, society's sense of decency or propriety." *Id.* at 2299–300. This "is viewpoint-based" discrimination. *Id.* at 2299. It draws a line based on a subjective view about whether the message is good or bad.

The Board's public-interest requirement runs into the same problem. It allows speakers to discuss issues of school policy and procedure if their comments "accord with, but not when their message defy," what the Board considers "in the public interest." *See id.* at 2300. This distinction discriminates based on viewpoint and thus facially violates the First Amendment.

2. The district court concluded otherwise by rewriting the public-interest rule to say something entirely different. Rather than consider what it means for speech to be "in the public interest," the court

"construe[d]" the rule as asking whether a speaker's "remarks would *be regarding a matter of public interest*." Mem. Op. & Order, R.30, PageID#252. Under this reading, the court concluded, the public interest rule merely allows Board members to decide whether the comments are "*about something of public interest*"—which the court considered a permissible subject-matter limitation. *Id.* at PageID#257. But that interpretation does not withstand even mild scrutiny. And even if it did, it would still violate the First Amendment.

Start with the text. No matter how hard the district court tried, it could not explain what the public interest rule means without changing its words. It did not explain what the phrase "in the public interest" means. It did not consider the difference between a statement that is "*in* the public interest" and one that is "*about* the public interest." It gave no linguistic explanation whatsoever for deciding that the word "in" can be interpreted to mean "about." Rather, the court simply swapped out the words in the policy for the words that it preferred. That is not an interpretation or construction of the text: it is rewriting.

But not even the canon of constitutional avoidance "allow[s] [courts] to re-write an unconstitutional statute to save it." *Bevan & Assocs., LPA*

*v. Yost*, 929 F.3d 366, 377 (6th Cir. 2019). Courts must consider "what the [rule] say[s]," even if that means finding it unconstitutional. *Maryville Baptist Church, Inc. v. Beshear*, 957 F.3d 610, 613 (6th Cir. 2020). And the public-interest rule does not say anything close to what the district court held. If it did, the court would have considered the meaning of the words in the policy, rather than change the words to new ones.

Nor should the phrase "in the public interest" cause much interpretive trouble in the first place. The phrase is not uncommon in either ordinary parlance or the law. Something is "in the public interest" when it is "likely to help the . . . public." *See* "*In the national/public interest,*" Merriam-Webster, available at https://perma.cc/4JV7-VJ2H. Likewise, in law an injunction is "in the public interest" when it promotes policies that society values. *See, e.g.*, *S. Glazer's Distribs. of Ohio, LLC v. Great Lakes Brewing Co.*, 860 F.3d 844, 853–54 (6th Cir. 2017). No matter the context, whether something is "in the public interest" boils down to deciding how society values it. But applied to speech, that kind of inquiry amounts to viewpoint discrimination. *See Brunetti*, 139 S. Ct. at 2299–300.

Linguistics aside, the district court's new version of the public-interest rule bears no relationship to the Board's actual practice. The court offered one example to explain its view about when a comment is about something of public interest under the new definition of the phrase it invented: speaking about "a school's current standardized testing procedures" is okay, but having "a father of a student seeking to discuss his child's individual performance on a school's standardized tests" is not. *Id.* at PageID#256. But the Board routinely hears public comments about individuals, from praising specific students, *see, e.g.*, 7/11/22 Board Mtg. Video, R.17-10 at 00:40–06:00, to sharing anecdotes about how school policies have personally impacted others, 10/3/22 Board Mtg. Video, R.17-13 at 33:36–34:20 (describing how "Safe Space" stickers and "Pride" flags at a high school helped a particular student feel more comfortable). The district court's made-up definition of "in the public interest" not only lacks textual support—it does not appear to have been adopted by any member of the Board.

Yet even if the district court's interpretation of the public-interest rule were plausible, it would still discriminate based on viewpoint. The district court's conclusion otherwise relies on a narrow theory of

viewpoint discrimination that the Supreme Court and this Court have repeatedly rejected. *See Rosenberger*, 515 U.S. at 831; *Am. Freedom Def. Initiative*, 978 F.3d at 498–99. That's because drawing a line between "public interest" and "private interest" excludes an entire class of viewpoints: those whose criticism of school policy depends on the way in which it has privately affected them. Consider the district court's own hypothetical to understand the problem: A father could criticize the school's standardized testing because it's too expensive, but he could not criticize school administrators for failing to prepare his son for the tests. Both comments are criticisms of the school's standardized testing, but only one viewpoint is excluded. Thus, even under the district court's revisionist reading of the rule, the policy prohibits some speech on "a subject otherwise permissible" because of the speaker's "perspective." *Lamb's Chapel*, 508 U.S. at 394.

D. The public-interest rule is an unconstitutional prior restraint.

1. The public-interest rule also violates the First Amendment by imposing an impermissible prior restraint. "A prior restraint is any law forbidding certain communications when issued in advance of the time that such communications are to occur." *McGlone v. Bell*, 681 F.3d 718,

733 (6th Cir. 2012) (quotation omitted). "Any system of prior restraints of expression bears a heavy presumption against its constitutional validity, and a party who seeks to have such a restraint upheld thus carries a heavy burden of showing justification for the imposition of such a restraint." *Id.*

To survive scrutiny, a prior restraint "must contain narrow, objective, and definite standards to guide the [government]." *Forsyth Cnty., Ga. v. Nationalist Movement*, 505 U.S. 123, 131 (1992) (quotation omitted). A rule fails this test when it allows public officials to decide whether to grant individuals access to a government forum based on only "their own ideas of 'public welfare.'" *See Shuttlesworth v. Birmingham*, 394 U.S. 147, 150–51 (1969).

The public interest rule does precisely that. First, it imposes a prior restraint: individuals must obtain Board approval before speaking on non-agenda items. Policy 1.404, R.17-4, PageID#131. But the criteria for approval gives Board members "virtually unbridled and absolute power" to decide what to do. *See Shuttlesworth*, 394 U.S. at 150. That's because whether an individual's comments are "in the public interest" is a "subjective standard[]" that "does not contain 'narrow, objective, and

definite standards' to guide" Board members approving requests. *See Int'l Outdoor, Inc. v. City of Troy*, 361 F. Supp. 3d 713, 717 (E.D. Mich. 2019) (quoting *Forsyth Cnty.*, 505 U.S. at 131). It is thus facially unconstitutional.

2. The district court disagreed—not about whether the rule contains a sufficiently objective criteria, but rather, about whether it imposes a prior restraint at all. Relying on *Lowery v. Jefferson County Board of Education*, 586 F.3d 427 (6th Cir. 2009), the district court held that a rule requiring pre-approval to speak at a school board meeting does not qualify as a prior restraint. Mem. Op. & Order, R.30, PageID#259. But that's not what *Lowery* says.

In *Lowery*, this Court considered a rule that allowed a school board to "deny[] a request [to speak] ahead of time" based on a determination that the comments would be repetitive or harassing. *Id.* at 434. Having already concluded that the rule was content neutral, *id.* at 433, the Court held that it followed that the rule did not amount to a "prior restraint," but was instead "a permissible time, place and manner regulation." *Id.* (citing *Thomas v. Chicago Park Dist.*, 534 U.S. 316, 322

(2002)). *Lowery* did not consider how that analysis would change for a content-based rule like the one here.

But that distinction is critical. *Lowery* relied on *Thomas*, which rejected a prior-restraint challenge precisely because the permitting scheme was a (content-neutral) time, place, and manner regulation. *Thomas*, 534 U.S. at 322. As *Lowery* explained, the Supreme Court in *Thomas* "rejected plaintiffs' characterization of the requirement, treating the policy as a permissible time, pace and manner regulation rather than as a prior restraint." 586 F.3d at 434. The *Lowery* Court then held that "[t]he same conclusion applies here." *Id.*

Not so for this case. "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message conveyed." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). The public-interest rule requires Board members to consider the content of a speaker's remarks to decide whether that speech is "in the public interest." And that analysis turns on what topic or viewpoint the speaker intends to discuss. It is content based, subject to a prior-

restraint challenge, and unconstitutional because it lacks any objective criteria for deciding who can and cannot speak.[5]

## II. THE REMAINING FACTORS FAVOR AN INJUNCTION BECAUSE PLAINTIFFS WILL ALMOST CERTAINLY WIN ON THE MERITS.

"Preliminary injunctions in constitutional cases often turn on likelihood of success on the merits, usually making it unnecessary to dwell on the remaining three factors." *Maryville Baptist Church*, 957 F.3d at 616. That's because "[t]he loss of First Amendment freedoms, for even minimal periods of time,' amounts to irreparable injury." *Sisters for Life*, 56 F.4th at 408 (quoting *Roman Catholic Diocese v. Cuomo*, 141 S. Ct. 63, 67 (2020) (per curiam)). Because the Board's policies "likely violate[] the First Amendment, applying [those policies] to [the

---

[5] In a footnote, the district court suggested that the public-interest rule may be content-neutral under *Lowery* because the Board's purpose for the rule (maintaining an orderly meeting) does not turn on the content of speech. Mem. Op. & Order, R.30, PageID#253, n.8. But the Supreme Court has since abrogated that aspect of *Lowery*. In *Reed*, the Supreme Court rejected the theory that a facially content-based law could become content-neutral based on the "government's purpose." 576 U.S. at 166. "That is incorrect." *Id.* Thus, whether the Board has a content-neutral justification for the public-interest rule does not matter given that it is facially content based, and to the extent that *Lowery* suggests otherwise, it is no longer good law.

plaintiffs] would irreparably injure them." *Id.* Likewise, the last two factors favor an injunction because "it is always in the public interest to prevent violation of a party's constitutional rights." *ACLU Fund of Mich. v. Livingston Cnty.*, 796 F.3d 636, 649 (6th Cir. 2015) (quotation omitted).

Thus, Plaintiffs' strong showing on the merits also satisfies the remaining elements for a preliminary injunction.

III. THE BOARD'S VOLUNTARY CESSATION NEITHER MOOTS PLAINTIFFS' CHALLENGE NOR VITIATES THEIR IRREPARABLE HARM.

The district court denied a preliminary injunction against the address and abusive-speech rules for one reason—and *only* one reason: the Board suspended these two policies after Plaintiffs sued. Mem. Op. & Order, R.30, PageID#261–62. But in doing so, the court ignored the ordinary factors that go into deciding whether voluntary cessation moots a party's claim—holding instead that the bare fact of voluntary cessation removes any threat of irreparable harm. That conclusion is incompatible with this Court's (and the Supreme Court's) decisions on irreparable harm in First Amendment cases.

A. The Board's voluntary cessation did not moot the request for a preliminary injunction.

A defendant's "voluntary cessation does not moot a case unless it is absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *West Virginia v. EPA*, 142 S. Ct. 2587, 2607 (2022) (cleaned up). This rule "protect[s] a party from an opponent who seeks to defeat judicial review by temporarily altering its behavior." *United States v. City of Detroit*, 401 F.3d 448, 451 n.1 (6th Cir. 2005). Thus, the Board bears a "heavy" burden to prove that a "once-live case has become moot." *West Virginia*, 142 S. Ct. at 2607. It must show with "absolute[] [clarity] that the allegedly wrongful behavior could not reasonably be expected to recur." *See id.* The Board cannot meet that burden for three reasons.

*First*, timing. A defendant changing its behavior in response to litigation "raises suspicions that its cessation is not genuine." *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 769 (6th Cir. 2019). Here, the Board altered its unlawful policies only after Plaintiffs sued. "If anything, this increases the [Board's] burden to prove that its change is genuine." *See id.* But "[t]here is no indication . . . that the [Board] was so much as *considering* changing [the policies]" before Plaintiffs sued.

*See id.* In fact, the record lacks any evidence explaining the change at all. The Board took two votes to approve the policy change—once on May 1, 2023 (R.26-1 PageID#232,), and again on June 5, 2023 (R.26-3, PageID#235). Not a single Board member even discussed the vote.[6] The only apparent reason for changing this policy was to avoid an injunction—precisely the kind of tactic that weighs against mootness. *See City of Detroit*, 401 F.3d at 451 n.1; *Speech First*, 939 F.3d at 769.

That makes the voluntary cessation here different than cases where this Court has held a change in policy moots the request for relief. In *Resurrection School v. Hertel*, 35 F.4th 524 (6th Cir. 2022) (en banc), for example, the Court considered voluntary cessation in the context of a pandemic policy the governor rescinded during litigation. Concluding that the case was moot, the Court explained that "the State rescinded the [policy] not in response to this lawsuit, but eight months later" in response to changed circumstances. *Id.* at 529. And the state made that clear: it relied on the changed circumstances, ("high vaccination rates, low case counts, new treatment options, and warmer weather") to

---

[6] *See* 05/01/23 Bd. Mtg. at 2:20:38–2:21:20, available at http://bit.ly/3X1ZPop; 06/05/23 Bd. Mtg. at 2:55:10–2:55:59, available at https://bit.ly/3oXUYtx.

explain its voluntary cessation *Id.* Thus, the Court had no reason to believe that the state rescinded its policy to avoid an injunction. *Id.*

Here, no similar explanation exists. The Board continued enforcing its illegal policies and practices until Plaintiffs moved for a preliminary injunction. *See* March 13, 2023 Bd. Mtg. at 19:00–19:37, available at https://bit.ly/4bJcBk3; Pla. Mot. Prel. Inj., R.16, PageID#78 (filed March 21, 2023). And the Board stopped immediately after. *See* April 3, 2023 Bd. Mtg. Video at 50:23–45, available at https://bit.ly/3SN5kHr. The only changed circumstance that might explain this maneuver is that Plaintiffs sought an injunction. But that kind of litigation tactic precludes applying the voluntary-cessation doctrine. *City of Detroit*, 401 F.3d at 451 n.1.

*Second*, the Board continues defending the constitutionality of both rules. After responding to the motion for a preliminary injunction, the Board stated that it "maintain[s] that [its] policies and practices have at all times existed within the proper bounds of the First Amendment both facially and as applied to the Plaintiffs." Joint Case Management Plan, R.23-1, PageID#210). It does not concede that its policy was unconstitutional, and it does not concede that invoking the policy to

silence Robin Lemons violated the First Amendment. And the Board "nowhere suggests that if this litigation is resolved in its favor it will not reimpose" the unlawful policy. *West Virginia*, 142 S. Ct. at 2607 (cleaned up). This, too, weighs against mootness. *Id.*; *see also Speech First*, 939 F.3d at 770 (rejecting a mootness claim after the university changed an unlawful policy but continued asserting that "there was no way the [prior policy] could have reasonably been understood as encroaching on students' First Amendment prerogatives" (cleaned up)).

*Third*, the ease with which the Board can (and does) alter its policies and practices weighs against mootness as well. When a change in policy arises from "ad hoc, discretionary, and easily reversible actions," courts give it little weight. *Speech First*, 939 F.3d at 768. The changes to the address and abusive-speech rules fit the bill. Changing the address rule required a simple vote. There was no "lengthy internal process," *id.* at 768–69—no one on the Board even explained why or what it was doing. And the process is so easy the Board has revised Policy 1.404 two additional times since dropping the rule, even though the Board only meets once a month.

The revision to the abusive-speech rule fares even worse. The rule itself never even appeared in a formal policy. Rather, the chair enforced this rule simply by announcing it at each meeting. The Board's voluntary cessation thus amounts to nothing more than someone deciding to change the script the board chair reads out loud. No one voted on this change, just as no one appears to have voted for the rule in the first place. And the record contains no evidence about who even wrote the new script. Nothing could be more "ad hoc, discretionary, and easily reversible" than this change. The Board's voluntary cessation deserves no weight whatsoever. *Speech First*, 939 F.3d at 768.

One more point. It matters that the board chair has a long history of ignoring the rules listed in Policy 1.404 and favoring her own discretionary authority instead. When "the discretion to effect the change [in policy] lies with one agency or individual," the government must show "significantly more" to demonstrate "that the voluntary cessation moots the claim." *Id.* Because Policy 1.404 has little practical impact on what rules the Board chair decides to enforce, any formal restrictions on revising the policy matters little.

The facts of this case show why. For years, the chair enforced the abusive-speech rule by threatening to terminate anyone's comments if they crossed the line—but that rule has never been part of Policy 1.404. And for years, the chair ignored the address rule even though it was voted on and adopted as part of the Board's official policy. So what difference does it make that the Board revised Policy 1.404 in response to this litigation and removed the address rule? And what difference does it make that the Board revised a script that the chair reads? There is no evidence that any member of the Board—and certainly not Farough—is bound by Policy 1.404 or the script that the chair reads. This *de facto* discretion to enforce whatever rules the chair finds appropriate undermines any solace that the Court could take in the Board's hasty decision to revise its rules after being sued.

Thus, Plaintiffs' challenges to the address and abusive-speech rules are not moot.

### B. Voluntary cessation does not vitiate irreparable harm in First Amendment cases.

Rather than analyze the standard for mootness, the district court avoided the issue by shifting its focus to irreparable harm. The court

explained that even if voluntary cessation does not moot a claim, it "may affect the ability to obtain injunctive relief, as by impacting the ability to show substantial and irreparable injury." Mem. Op. & Order, R.30, PageID#262. But the court never explained how or under what circumstances that "may" happen. Instead, the district court held simply that Plaintiffs no longer face irreparable harm based on the sole fact that the Board re-wrote its policies. *See id.* (deciding in one sentence that Plaintiffs do not face irreparable harm because the challenged rules "are no longer included in" the Board's policies). And it decided that none of the other factors for granting a preliminary injunction matter.

The effect of that holding is to nullify the voluntary-cessation doctrine in every case involving a preliminary injunction. If the *only* fact that matters is whether the defendant changed its conduct, then district courts would have to deny a preliminary injunction whenever that happens. But the voluntary-cessation doctrine exists to prevent that very problem by requiring courts to consider the broader circumstances before denying a plaintiff relief. *City of Detroit*, 401 F.3d at 451 n.1.

The district court's conclusion otherwise does not square with Supreme Court precedent. In *Roman Catholic Diocese*—another pandemic case raising voluntary-cessation issues—the Supreme Court considered the constitutionality of the New York governor's executive orders imposing occupancy limits on certain kinds of businesses and organizations. 141 S. Ct. at 65–66. Two religious groups argued that the orders subjected houses of worship to disparate treatment in violation of the Free Exercise Clause. But by the time the case made it to the Supreme Court, the governor had amended his executive order so that the occupancy limits no longer applied to the plaintiffs. Despite that, the Supreme Court held that "[t]here can be no question that the challenged restrictions, if enforced, will cause irreparable harm." *Id.* at 67. The governor's voluntary cessation did not change that calculus.

The Supreme Court reached this holding over a dissent that argued—like the district court below—it "should withhold relief because the relevant circumstances have changed." *Id.* at 68. The dissent argued that "[a]n order telling the Governor not to do what he's not doing fails to meet [the] stringent standard [for a preliminary injunction]." *Id.* at 75 (Roberts, C.J., dissenting). But the majority categorically rejected

that position as having "no justification." *Id.* at 68. That the governor had rescinded his executive order did not vitiate the threatened irreparable harm.

This Court's precedent is in accord. The best example is *Speech First*—a case that the district court erroneously read as supporting its decision. Order, R.30, PageID#262 (citing *Speech First*, 939 F.3d at 770). In fact, *Speech First* stands for exactly the opposite of what the court held below. There, this Court vacated an order denying a preliminary injunction after reversing the trial court's finding that voluntary cessation mooted the issue. *Id.* at 770. The trial court had analyzed mootness as part of the merits, but it also held that the defendant's voluntary cessation "remove[d] the threat to students' free speech rights" and thus deprived the plaintiff of irreparable harm. *Speech First, Inc. v. Schlissel*, 333 F. Supp. 3d 700, 715 (E.D. Mich. 2018), *vacated by Speech First*, 939 F.3d at 770. On appeal this Court reversed on mootness and remanded the case for the district court to consider the plaintiff's likelihood of success on the merits.

The Court made clear that *even if* voluntary cessation weighs against a finding of irreparable harm, the district court must still consider the

likelihood of success on the merits because it will "often" overcome the other factors in First Amendment cases. *Id.* at 770 (quoting *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012)). When the plaintiff has a strong likelihood of success on a constitutional challenge, an injunction is appropriate because even a "minimal" chance of injury is irreparable. *Sisters for Life*, 56 F.4th at 408.

Like *Roman Catholic Diocese*, the *Speech First* Court reached its holding over a dissent that advocated doing exactly what the district court did here. The dissent argued that the Court should affirm because "there is no reason to presume that there will be irreparable injury" after the defendants' voluntary cessation. *Id.* at 776 (White, J., dissenting). But the majority disagreed. Even in cases of voluntary cessation, the threat of irreparable harm implicit in a First Amendment violation requires the district court to factor in how likely the plaintiff is to succeed on the merits. *Id.* at 770.

Here, Plaintiffs' likelihood of success on the merits easily outweighs any diminishment of their irreparable harm. The Court should reverse the district court's contrary decision.

C. The Board's discriminatory enforcement of its obviously unconstitutional rules creates an ongoing threat of irreparable harm.

There is yet one more reason why the Board's voluntary cessation cannot alone undo the irreparable harm in this case. The Board's history of allowing the chair to ignore its written policies undermines the effect of any policy changes it might implement. How can Plaintiffs take comfort in the fact that the Board removed the address rule from Policy 1.404 when the abusive speech rule was never part of the policy in the first place? The chair has the apparent authority to enforce any rule she wants—regardless of what Policy 1.404 says. So the Board's "revision" to its policies does nothing to quell the chilling effect that the Board's history of enforcement has caused.

In Free Speech cases, "[it] is well-settled that a chilling effect on one's constitutional rights constitutes a *present* injury in fact.'" *McGlone*, 681 F.3d at 729 (quoting *G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1076 (6th Cir. 1994)) (emphasis added). The Board's historical practice of threatening to enforce non-existent rules and discriminatorily enforcing the rules that actually exist chills Plaintiffs' protected speech. And that chilling effect amounts to

irreparable harm that continues on despite the Board's attempt at

mooting the case.

## CONCLUSION

The Court should reverse the district court's decision denying

Plaintiffs' motion for a preliminary injunction.

February 28, 2024                           Respectfully submitted by,

                                            /s/ Brett R. Nolan
John I. Harris                              Brett R. Nolan
SCHULMAN, LEROY & BENNETT PC                INSTITUTE FOR FREE SPEECH
3310 West Avenue                            1150 Connecticut Ave., N.W.
Suite 460                                   Suite 801
Nashville, Tennessee 37203                  Washington, DC 20036
615-244-6670                                202-301-3300
                                            bnolan@ifs.org

February 28, 2024                           *Counsel for Plaintiffs-Appellants*

CERTIFICATE OF COMPLIANCE

As required by Federal Rule of Appellate Procedure 32(g) and 6th Cir. R. 32, I certify that this brief complies with the type-volume limitation in Fed. R. App. P. 32(a)(7)(B) because it contains 9,545 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and 6th Cir. R. 32(b)(1).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced Serif typeface, Century Schoolbook, in 14-point font using Microsoft Word.

<u>/s/ Brett R. Nolan</u>

CERTIFICATE OF SERVICE

I certify that on February 28, 2024, I electronically filed this brief with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit using the CM/ECF system. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ Brett R. Nolan

The plaintiffs designate the following as relevant documents from the district court:

| Complaint | R.1 | PageID#1–30 |
|---|---|---|
| Mot. for Prelim. Inj. | R.16 | PageID#78–80 |
| Memo. Supporting Prelim. Inj. | R.17 | PageID#81–109 |
| Robin Lemons Declaration | R.17-1 | PageID#110–17 |
| Amanda Price Declaration | R.17-2 | PageID#118–26 |
| Policy 1.404 (June 7, 2021) | R.17-4 | PageID#130–32 |
| October 3, 2022 Board Meeting Video (notice of conventional filing) | R.17-13 | PageID#141 |
| Answer | R.20 | PageID#156–75 |
| Response to Mot. for Prelim. Inj. | R.21 | PageID#176–92 |
| Board Chair Script Original | R.21-1 | PageID#193 |
| Board Chair Script Revised | R.21-2 | PageID#194 |
| Reply in Support of Prelim. Inj. | R.22 | PageID#197–206 |
| Joint Case Management Plan | R.23-1 | PageID#209–16 |

| | | |
|---|---|---|
| Supplemental Response to Prelim. Inj. | R.26 | PageID#228–31 |
| Revised Policy 1.404 (June 5, 2023) | R.26-4 | PageID#236–37 |
| Reply to Supplemental Response to Prelim. Inj. | R.27 | PageID#238–42 |
| Mem. Op. & Order Denying Prelim. Inj. | R.30 | PageID#247–62 |
| Notice of Appeal | R.32 | PageID#264–65 |